**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |  |
|---|---|---|
| | * | |
| BELLA MANGUIAT, | | |
| | * | |
| **Plaintiff,** | | |
| v. | * | **Case No.: GJH-13-1165** |
| | | |
| BOARD OF EDUCATION OF PRINCE | * | |
| GEORGE'S COUNTY, | | |
| | * | |
| **Defendant.** | | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

This is a race-based and nationality-based discrimination and retaliation case brought by Bella Manguiat ("Manguiat") against the Board of Education of Prince George's County ("the School Board") for purported violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000-e *et seq.*, and 42 U.S.C. § 1981. In addition to Manguiat's civil rights claims, she also raises a breach of contract claim against the School Board. This Memorandum Opinion and accompanying Order address the School Board's motion for summary judgment, ECF No. 33, and its motion to strike declarations attached to Manguiat's opposition, ECF No. 42. A hearing is not necessary. *See* Loc. R. 105.6 (Md.). For the reasons stated below, the School Board's motion to strike is GRANTED and its motion for summary judgment is GRANTED, in part, and DENIED, in part.

1

## I.      BACKGROUND

Manguiat, a Filipino woman, was a special education teacher employed by the School Board beginning in 2008 under an H-1B visa which was set to expire on November 4, 2011.[1] *See* ECF No. 33-2. Manguiat's employment arrangement was set forth in a contract between her and the School Board which required her to be placed on a mandatory two year probationary period. *See* ECF No. 36-10. The School Board could extend this probationary period for a third year if, at the end of Manguiat's second school year (2009-2010), she did not qualify for tenure. *See id.* But the probationary period could only be extended if the School Board provided Manguiat with adequate notice of its decision to extend this period. Specifically, the contract required the School Board to provide Manguiat with notice of its decision to extend her probationary period either before June 15, 2009 or sixty (60) days prior to the second anniversary of her start date – *i.e*. November 9, 2009. *See id.*

When Manguiat was initially hired by the School Board in January 2008, she was assigned to teach sixth grade special education math and science at Benjamin Foulis Elementary School. *See* ECF No. 3 at ¶ 13. In the summer of 2008, the entire special education program at Benjamin Foulis Elementary School was moved to Francis Scott Key Elementary School. *See* ECF No. 33-3 at 2. As a result, Manguiat was transferred to Francis Scott Key Elementary School where she was assigned to co-teach fifth grade special education math with a male colleague, Mr. Ruffins, and was supervised by the school's principal, Ms. Judie Strawbridge ("Strawbridge"), an African-American. *See* ECF Nos. 33-6 & 3 at ¶ 18.

---

[1] The H-1B is a non-immigrant visa in the United States pursuant to the Immigration and Nationality Act, Section 101(a)(15)(H), that allows employers, such as the School Board, to temporarily employ foreign workers in specialty occupations, like teaching.

On October 11, 2009, just one month into the 2009-2010 school year, Strawbridge conducted an interim evaluation of Manguiat for which she received an "unsatisfactory" rating. *See* ECF No. 33-5.  Following Manguiat's evaluation, Strawbridge, Manguiat, and other School Board personnel participated in an interim conference on December 18, 2009 to address Manguiat's unsatisfactory performance. *See* ECF No. 33-6. During the conference, Manguiat expressed displeasure with her performance evaluation, but did not, at that time, claim she was being discriminated against based on her race or nationality. *See* ECF No. 3 at ¶ 29. She did, however, complain to Strawbridge (for the first time) about working with Mr. Ruffins. *See* ECF No.  33-3 at 9-10. According to Manguiat, Mr. Ruffins touched her inappropriately and, as a result, she no longer felt comfortable working with him. *See id.* Manguiat contends that Strawbridge did nothing to address her concerns. As such, on February 8, 2010, Manguiat filed an internal complaint of harassment against Mr. Ruffins. *See* ECF No. 33-19. After Manguiat filed her complaint, Strawbridge contends that she tried to mediate the issues between Mr. Ruffins and Manguiat but, when it became clear that they could no longer work together, she separated them. *See* ECF No. 33-4 at 5. Ultimately, Mr. Ruffins did not return to Francis Scott Key Elementary School the following school year. *See id.* at 6.

In early 2010, just weeks after Manguiat's interim conference with Strawbridge, Manguiat claims she started experiencing discrimination and harassment based on her race and/or nationality. According to Manguiat, in January 2010, Strawbridge refused to give her praise for her students' improved test results. *See* ECF No. 3 at ¶ 31. Additionally, Manguiat contends that on January 26, 2010, Strawbridge held a meeting with the fifth grade teaching team without giving Manguiat advanced notice. *See id.* at ¶ 32. Manguiat, who was unable to attend the meeting, was reprimanded the next day by Strawbridge. *See id.* at ¶ 33. That same day,

Manguiat claims that Strawbridge recommended that Manguiat's probationary period be extended for an additional year. Manguiat reported this allegedly discriminatory and harassing behavior to the School Board's Equity Assurance and Compliance Department on February 2, 2010.  *See* ECF No. 36-16 at ¶ 12; *see also* ECF No. 36-1 at 11.

Manguiat claims that after she reported this behavior, Strawbridge and the School Board starting taking retaliatory actions against her. Specifically, Manguiat contends that after reporting this activity, her probationary period was extended for an additional year when, on April 20, 2010, the Superintendent of Prince George's County Public Schools wrote a letter to Manguiat indicating that she "did not qualify for tenure at the end of [her] second year based on established performance evaluation criteria." ECF No. 33-17. Manguiat contends that this action was not only retaliatory, but also in violation of her contract because the School Board failed to provide her with timely notice of its decision to extend her probationary status. Additionally, Manguiat contends the School Board breached the contract and treated her differently than other non-Filipino teachers by failing to provide her with a mentor, as was required for teachers whose probationary period had been extended. *See* ECF No. 36-10. Manguiat also alleges that the School Board treated her differently than non-Filipino teachers when, at the end of the 2009-2010 school year, she did not receive an end-of-the-year evaluation. *See* ECF No. 3 at ¶ 47. Manguiat further contends that, in addition to the alleged disparate treatment and retaliation, she experienced a racially hostile work environment during the 2009-2010 school year when she was called "stupid" and humiliated by school staff; was referred to as Ms. Natividad – who was another teacher at Francis Scott Key Elementary School; and was told to go back to her country. *See* ECF No. 3 at ¶¶ 24-26.

According to Manguiat, the 2010-2011 school year was not much better. Manguiat claims she was not provided supplies to start the year, was still not given a mentor, and continued to receive negative performance reviews. *See* ECF No. 36 at 13. Regarding her performance, Manguiat was formally observed on four occasions during the 2010-2011 school year: November 29, 2010 and February 28, 2011 by Strawbridge; December 6, 2010, by Ms. Diane Reisenger, Assistant Principal; and March 7, 2011 by Ms. Margaret Stroman, Area III Instructional Specialist. *See* ECF No. 43-4. Based on the observations from November and December 2010, the School Board, on January 10, 2011, issued Manguiat an interim evaluation indicating that her performance was either unsatisfactory or needed to improve in five out of twelve categories concerning Manguiat's teaching preparation. *See* ECF No. 33-7. Not long after Manguiat received this unsatisfactory interim evaluation, Manguiat met with Ms. Tricia Hairston, Area Assistant Superintendent, and Strawbridge on January 28, 2011, during which a performance improvement plan was developed. *See* ECF No. 43-4.  Ultimately, following two more observations in February and March 2011, the School Board determined that Manguiat failed to demonstrate significant progress in a number of areas and was given a final evaluation on March 8, 2011, which reflected six unsatisfactory ratings in the areas of learning climate, instruction, and professionalism. *See* ECF No. 33-8. As such, Manguiat received an overall "unsatisfactory" rating on May 27, 2011. Then, on June 23, 2011, the School Board lowered Manguiat's teaching certificate to "second class" which, according to her, meant she would not be eligible for a salary increase. *See* ECF No. 36-1 at 14. But at no point during Manguiat's employment with the School Board did her salary or benefits ever decrease. *See* ECF No. 33-3 at 18-19.

Prior to the start of the 2011-2012 school year, the School Board agreed to a voluntary debarment[2] from sponsorship of H-1B visa applications for its employees as part of a settlement of a wage and hour dispute with the Department of Labor. *See* ECF No. 33-9 at 2-4; *see also* ECF No. 33-11. As a result of the debarment, the School Board could not sponsor any visa renewals as of July 2011, and continuing until March 16, 2014. *See* ECF No. 33-12. Thus, Manguiat's H-1B visa, which was set to expire in November 2011, could not be renewed by the School Board. As such, Manguiat's employment with the School Board ended on November 4, 2011 when her visa expired. *See* ECF No. 33-13; *see also* ECF No. 33-14.

Ultimately, Manguiat filed suit against the School Board alleging that she was the victim of (1) race-based and nationality-based discrimination; (2) a racially hostile work environment[3]; and (3) retaliation for complaining of the alleged discrimination and harassment. Manguiat also contends that the School Board breached its contract with her by failing to provide her with a mentor and by failing to provide her with the requisite notice before extending her probationary period. The School Board has filed a motion for summary judgment. *See* ECF No. 33. For the reasons discussed more fully below, the Court will grant the School Board's motion for summary judgment as to Manguiat's discrimination, retaliation, and hostile work environment claims, and will deny the motion as it relates to her breach of contract claim.

---

[2] Debarment occurs when an organization is found by the Department of Labor to have committed certain violations of federal wage and hour laws. When an organization is debarred, the Department of Labor may ban that organization from future access to the H-1B program and other immigrant programs for a period of at least one year. *See* ECF No. 33-12.

[3] Despite Manguiat's allegations concerning alleged sexual harassment by Mr. Ruffins, Manguiat does not include a hostile work environment claim based on sex; rather, Manguiat's hostile work environment claim is based on race and nationality.

## II.      DISCUSSION

### A.      Motion to Strike

Prior to addressing the School Board's motion for summary judgment, the Court must

first address the School Board's motion to strike. *See* ECF No. 42. In her opposition to the

School Board's motion for summary judgment, Manguiat submitted, among other items, three

declarations from former co-workers. *See* ECF Nos. 36-7, 36-23, 36-24. Two of the declarants,

Clarette Harrison and Joyce Pullen, were identified in interrogatory responses as individuals with

knowledge of Manguiat's job performance and were discussed in deposition testimony. *See* ECF

No. 44 at 1-2. The third, Carolyn Brooks, was never previously disclosed in interrogatory

responses. The School Board has moved to strike these declarations under Fed.R.Civ.P. 37(c)(1)

because Manguiat failed to timely identify these individuals in its response to an interrogatory

requesting a list of potential witnesses.[4]

"Rule 37(c)(1) provides that a party who fails to identify a witness as required by Rule

26(a) or (e) is not allowed to use that witness to supply evidence on a motion." *Hoyle v.*

*Freightliner, LLC*, 650 F.3d 321, 329 (4th Cir. 2011). "Escape from the sanction requires a

showing that the failure to disclose is substantially justified or harmless." *Id.*  Because none of

the declarants were identified as potential witnesses until three months after discovery ended

when Manguiat opposed the School Board's motion for summary judgment, the Court may strike

the declarations if Manguiat's failure to disclose was not substantially justified or harmless.

---

[4] Typically, the information at issue here would be provided pursuant to the disclosure
requirement of Fed.R.Civ.P. 26(a)(1). The standard Scheduling Order issued by Judge Chasnow
in this case, however, stated that Rule 26(a)(1) disclosures "need not be made." ECF No. 11 at 2.
Nonetheless, the School Board's Interrogatory No. 1 requested that Manguiat "[i]dentify all
persons who are likely to have personal knowledge of any fact alleged in or relevant to your
lawsuit or who you anticipate will be called as a witness at trial or deposition     . . . ." ECF No.
42-2 at 2. Thus, case law discussing Rule 26(a) applies with equal force to this matter.

"In determining whether nondisclosure of evidence is substantially justified or harmless, [the Court] consider[s] '(1) the surprise to the party against whom the witness was to have testified; (2) the ability of the party to cure that surprise; (3) the extent to which allowing the testimony would disrupt the trial; (4) the explanation for the party's failure to name the witness before trial; and (5) the importance of the testimony.'" *Id.* (quoting *Southern States Rack and Fixture v. Sherwin–Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2003)). In light of these factors, the Court finds that Manguiat has not demonstrated that her failure to disclose the witnesses was substantially justified or harmless.

Specifically, the School Board has been prejudiced by the surprise identification of the declarants as witnesses. Had Manguiat properly and timely identified the declarants as witnesses, the School Board would have had the opportunity to depose the declarants in order to assess their degree of knowledge. Without that opportunity, the School Board is unable to meaningfully refute or otherwise challenge the veracity of the statements contained in the declarations. And at this late juncture, Manguiat cannot cure the impact of the surprise identification without causing significant disruption to this case. Indeed, discovery is closed, the School Board's summary judgment motion is fully briefed, and this matter has been pending for more than two years.

Manguiat argues that the School Board should have been on notice that Harrison and Pullen were potential witnesses given Manguiat's reference to them during her deposition and her response to Interrogatory No. 2 which required identification of individuals with knowledge of Manguiat's job performance[5]. The Court finds, however, that these references were insufficient to alert the School Board of the declarants as potential witnesses, as none of the declarants were identified in response to Interrogatory No. 1, which specifically sought

---

[5] As to Brooks, who was not mentioned at all in the interrogatory responses, the only explanation given is that there was an oversight by counsel.

8

identification of potential witnesses and persons with relevant knowledge. *See Hoyle*, 650 F.3d at 330 (finding no abuse of discretion in district court's striking of the declaration of a witness who had been referenced in a separate interrogatory and discussed in deposition testimony, where the identity of the declarant was not disclosed in response to an interrogatory specifically requesting possible witnesses until after motion for summary judgment had been filed).  Accordingly, the Court cannot find that the failure to disclose the potential witnesses was substantially justified or harmless. The Court will therefore grant the School Board's motion to strike and will not consider ECF Nos. 36-7, 36-23, 36-24.

   **B.    Summary Judgment**

   Having granted the School Board's motion to strike, the Court must next address its motion for summary judgment. Summary judgment is proper if there are no issues of material fact and the moving party is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of material fact is only "genuine" if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party. *See Anderson*, 477 U.S. at 248-49. However, the nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1986). The Court may only rely on facts supported in the record, not simply assertions in the pleadings, in order to fulfill its "affirmative obligation . . . to prevent 'factually unsupported claims or defenses' from proceeding to trial." *Felty v. Grave–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987). When ruling on a motion for summary judgment, "[t]he evidence of the non-movant

is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson*, 477 U.S. at 255. For the reasons discussed more fully below, the Court will grant, in part, and deny, in part, the School Board's motion for summary judgment.

### 1. Hostile Work Environment

Counts V and VII of Manguiat's complaint raise claims of a hostile work environment under Title VII and § 1981, respectively. "The elements are the same under either § 1981 or Title VII." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001). Thus, to state a claim for a hostile work environment based on race or nationality under either Title VII or § 1981, a plaintiff must show that: (1) she experienced unwelcome harassment; (2) the harassment was based on her race or nationality; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *See Bass v. E.I. Dupont de Nemours & Co.,* 324 F.3d 761, 756 (4th Cir. 2003). Here, the vast majority of the conduct of which Manguiat complains was not based on her nationality or race. And as for those few statements that were arguably based on her race or nationality, those statements were not sufficiently severe or pervasive to create an abusive work environment. *See* ECF No. 36-1 at 21-23.[6]

---

[6] The Court notes that Manguiat includes allegations in her complaint that appear to relate to a sex-based hostile work environment claim. Specifically, Manguiat contends that Mr. Ruffins touched her leg inappropriately. *See* ECF No. 33-3 at 9-10. Even if Manguiat had attempted to allege a sex-based hostile work environment claim, her attempt would fail. The solitary allegation that Mr. Ruffins touched Manguiat's leg on one occasion is simply not sufficient to establish severe or pervasive conduct for purposes of a sex-based hostile work environment. *See Raley v. Board of St. Mary's County Comm'rs*, 752 F.Supp. 1272, 1280 (D. Md. 1990) (granting summary judgment for defendant because the actions complained of, consisting of isolated incidents of offensive touching and sexual innuendos, were not sufficiently severe). Nor is there any basis upon which to impose liability upon the School Board for Mr. Ruffins' conduct. In a case of harassment by a coworker, an employer may be held liable if it "knew or should have known of the harassment, and took no effectual action to correct the situation." *Spicer v. Commonwealth of Virginia Dept. of Corrections*, 66 F.3d 705, 710 (4th Cir. 1995). Despite

Specifically, Manguiat contends that Strawbridge subjected her to a racially hostile work environment by (1) occasionally referring to her as Ms. Natividad – another teacher at Francis Scott Key Elementary School; (2) calling her insubordinate for not attending a meeting; (3) giving her unsatisfactory performance reviews; (4) failing to give her praise for her students' test results; and (5) asking her on two occasions "why don't you resign." *See* ECF No. 3 at ¶¶ 24, 31, 32, 60, 62. In addition to Strawbridge's alleged actions, Manguiat also maintains that she was called "stupid" on two occasions by various school employees. *See id.* at ¶ 25. None of these actions, however, relate to Manguiat's race or nationality; rather, they are all racially neutral comments that, although bothersome to Manguiat, cannot form the basis of a race-based or nationality-based hostile work claim. *See Smith v. Allied Sys., Ltd.*, 2000 WL 708909, at *5 (D. Md. 2000) *aff'd* 232 F.3d 889 (4th Cir. 2000) (rejecting claim of hostile environment discrimination where plaintiff offered "no evidence that the harassment he complains about was based on race"); *Settle v. Baltimore County*, 34 F.Supp.2d 969, 1003 (D. Md. 1999) *aff'd sub nom. Harris v. Earp*, 203 F.3d 820, 2000 WL 51282 (4th Cir. 2000), *Settle v. Baltimore County Police Dep't*, 203 F.3d 822, 2000 WL 51283 (4th Cir. 2000) (refusing to consider allegations when they are "racially neutral, and there is no evidence in the record that the underlying acts and omissions . . .  occurred because [plaintiff] is an African–American"); *Watson v. Gutierrez*, 2006 WL 1647116, at *5 (E.D. Va. June 6, 2006) (hostile work environment was not

---

Manguiat's allegation that the School Board did nothing to address the alleged harassment, Strawbridge's unrefuted deposition testimony reveals that shortly after learning of Manguiat's concerns regarding Mr. Ruffins, she attempted to mediate the situation. *See* ECF No. 33-4 at 5. Ultimately, however, when it became clear to Strawbridge that Mr. Ruffins and Manguiat could no longer co-exist, she separated them and Mr. Ruffins did not return to teach the following year. *See id.* at 6. Under these circumstances, there is no basis upon which to impose liability on the School Board. Thus, to the extent Manguiat intended to raise a sex-based hostile work environment claim, that claim fails.

shown when "[e]ach of Plaintiff's allegations involve[d] actions that facially b[ore] no relation to Plaintiff's race").

The remaining few comments upon which Manguiat relies, although not necessarily race-neutral, are not sufficiently severe or pervasive to support a hostile work claim. In determining whether harassing conduct is severe or pervasive, the Court must consider: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." *Smith v. First Union Nat'l Bank,* 202 F.3d 234, 242 (4th Cir. 2000). Here, Manguiat relies on three isolated comments from various individuals to make this showing. Specifically, Manguiat claims that on her last day of work before her visa expired, Strawbridge asked her if she planned on returning to the Philippines. *See* ECF No. 3 at ¶ 24 Additionally, Manguiat claims that students in her class and the school janitor told her to "go back to your country." *Id.* at ¶ 26; *see also* ECF No. 36-16 at ¶ 35. These isolated comments, however, were neither physically threatening nor humiliating, nor did they interfere in any way with Manguiat's work performance.

Furthermore, in evaluating a hostile work environment claim, "[t]he status of the harasser also is relevant . . . ." *Boyer-Liberto v. Fontainebleau Corp.*, No. 13-1473, 2015 WL 2116849, at *10 (4th Cir. May 7, 2015). For example, "[i]f the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." *Vance v. Ball State Univ.*, 133 S.Ct. 2434, 2439 (2013). Here, as it relates to the janitor, there is no evidence to suggest that the School Board was negligent in controlling the working conditions. As for the students, their actions cannot be imputed to the School Board as they are neither agents nor employees of the School Board. *See Ross v. Corporation of Mercer University*, 506 F.Supp.2d

1325, 1361 (M.D. Ga. March 30, 2007) (holding that evidence of threatening and other intimidating actions of university students was insufficient to establish that the university retaliated against a student who reported sex discrimination); *see also Miles v. Washington*, No. 08-166, 2009 WL 259722, at *4 (E.D. Okla. Feb. 2, 2009) (in a Title VII retaliation claim finding that "[t]he students are not agents of the school and their actions cannot be considered the actions of the school"). As such, the Court finds that the actions of the janitor and the students are not sufficiently severe or pervasive to establish a hostile work environment claim based on race or nationality. The Court will therefore grant the School Board's motion for summary judgment as to Counts V and VII.

## 2.    Disparate Treatment

Manguiat's complaint also includes various claims (Counts II, III, VI) for race-based and nationality-based disparate treatment arising under Title VII and 42 U.S.C. § 1981. *See* ECF No. 3 at 9-10, 12. To establish a claim for race-based or nationality-based discrimination under Title VII or § 1981, Manguiat may proceed using either of two methods. First, she may demonstrate "through direct or circumstantial evidence" that her race or nationality "motivated the employer's adverse employment decision," *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004), or, alternatively, she may "proceed under a 'pretext' framework" – commonly referred to as the *McDonnell Douglas* approach – "under which the employee, after establishing a *prima facie* case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually pretext for discrimination." *Id.* at 285. Because Manguiat has presented no direct evidence that the School Board discriminated against her, she must establish her case circumstantially using the pretext

framework established in *McDonnell Douglas. See McDonnell Douglas Corp. v. Green*, 411
U.S. 792 (1973).

Under the *McDonnell Douglas* framework, Manguiat must first demonstrate a prima facie
case of disparate treatment, which requires her to show that: (1) she is a member of a protected
class; (2) she was performing at a level that met her employer's legitimate expectations at the
time of the adverse employment action; (3) she suffered an adverse employment action; and (4)
her employer treated similarly situated employees outside her protected class more favorably.
*See Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010); *Hill*, 354 F.3d at 285.[7]
Here, Manguiat's disparate treatment claims fail because several of the actions that she
challenges are not adverse employment actions. And as for those actions that arguably are
adverse, they cannot support her claims because Manguiat has failed to show how she was
treated differently from similarly situated non-Filipino employees as it relates to those alleged
actions. Moreover, even if Manguiat had met her prima facie case, the School Board has
provided compelling evidence of its legitimate non-discriminatory reasons for its actions –
namely, Manguiat's unsatisfactory performance. Manguiat has provided no evidence that this
proffered reason was a pretext for a discriminatory motive

### a.      Adverse Employment Action

"An adverse employment action is a discriminatory act that 'adversely affect[s] the terms,
conditions, or benefits of the plaintiff's employment.'" *Blakes v. City of Hyattsville*, 909
F.Supp.2d 431, 436 (D. Md. 2012) (quoting *Thorn v. Sebelius*, 766 F.Supp.2d 585, 598 (D. Md.
2011). An "adverse employment action" must affect "a significant change in employment status,

---

[7] The elements for a disparate treatment claims under Title VII are the same as those required for
a disparate treatment claim arising under § 1981. *See Gairola v. Virginia,* 753 F.2d 1281, 1285
(4th Cir. 1985)

such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle*, 650 F.3d at 337 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). "Although conduct short of ultimate employment decisions can constitute adverse employment action, there still must be a tangible effect on the terms and conditions of employment." *Geist v. Gill/Kardash P'ship,* 671 F. Supp.2d 729, 737 n. 6 (D. Md. 2009).

Here, Manguiat contends that she suffered the following adverse employment actions: (1) having her probationary period extended; (2) receiving poor performance evaluations; (3) not being provided a mentor; (4) not being provided with school supplies; (5) not being provided an annual review for the 2009-2010 school year; and (6) having her teaching certificate lowered to "second-class." *See* ECF No. 36-1 at 18. Several of these actions, however, are not adverse employment actions and therefore cannot support her disparate treatment claims. For example, the School Board's failure to provide Manguiat with an annual review at the completion of the 2009-2010 school year was not an adverse action as it had no immediate effect on the terms, conditions, or benefits of her employment. Indeed, there is no evidence to suggest that had Manguiat been evaluated in June 2010 she would have received a pay increase, a promotion, or otherwise benefited from her review. If anything, the record suggests that had Manguiat been given her annual performance review that year, it would have been unsatisfactory. In fact, just three months prior, the School Board informed her of its decision to extend her probationary period due to her performance deficiencies. *See* ECF No. 33-17. Manguiat has therefore failed to establish how the School Board's failure to give her an annual review for the 2009-2010 school year effected "a significant change in [her] employment status." *Hoyle*, 650 F.3d at 337. As such,

the Court finds that this action is not an adverse employment action for purposes of a disparate treatment claim.

Nor is the School Board's alleged failure to provide Manguiat with supplies or a mentor an adverse employment action. To be certain, Manguiat has not even alleged, much less demonstrated, that the denial of supplies or a mentor affected the terms and conditions of her employment. At most, Manguiat appears to contend that had she been provided with a proper mentor, her performance would have improved and her teaching certificate would not have been lowered to second-class.[8] However, "to be adverse, the denial of a . . . training opportunity must have a discernible, as opposed to a speculative, effect on the terms, conditions, or privileges of one's employment." *Edwards v. EPA*, 456 F.Supp.2d 72, 86 (D.D.C.2006). Here, the impact of being denied a suitable mentor was entirely speculative. Accordingly, the School Board's alleged failure to provide Manguiat with a full-time mentor was not an adverse employment action. *See e.g.*, *Johnson v. Danzig,* 213 F.3d 631, 2000 WL 458887, *2 (4th Cir.2000) ("letters of reprimand and admonishment and the denial of training are not actionable adverse employment actions"); *Cohens v. Maryland Dep't of Human Res.*, No. 11-3419, 2013 WL 3944451, at *6, n.41 (D. Md. July 30, 2013)  ("Cohens's allegation that she was 'denied' statewide training opportunities, and that her training schedule was reduced – without any evidence that her salary or other elements of employment status were thereby affected – also does not [constitute an adverse employment action"]); *but cf. Higgins v. Gonzales*, 481 F.3d 578, 590 (8th Cir. 2007) (recognizing that "lack of mentoring or supervision might constitute an adverse employment action" if the plaintiff "was actually left to 'flounder' or was negatively impacted by the lack of

---

[8] Manguiat concedes that she was provided with some form of mentoring from Ms. Nettie McCain ("McCain"). *See* ECF No. 36-1 at 1. Manguiat claims, however, that this mentor was a "sham" because "Ms. McCain was not a full-time mentor from the professional development office . . . ." *Id.* at 1-2; *see also* ECF No. 3 at ¶ 54.

supervision or mentoring"). Assuming, without deciding, that the remaining actions of which

Manguiat complains (*i.e.* the extension of her probationary period, the lowing of her teaching

certificate, and her poor performance reviews in 2010 and 2011) were all adverse employment

actions, these actions still do not support Manguiat's disparate treatment claims as she has failed

to satisfy the fourth prong of the prima facie case.

### b.      Similarly Situated Employees

The fourth prong of the prima facie case requires Manguiat to demonstrate that the

School Board treated similarly situated employees outside Manguiat's protected class more

favorably. *See Coleman*, 626 F.3d at 190. "Such a showing would include evidence that the

employees 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged

in the same conduct without such differentiating or mitigating circumstances that would

distinguish their conduct or the employer's treatment of them for it.'" *Haywood v. Locke*, 387

Fed. Appx. 355, 359 (4th Cir. 2010) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th

Cir. 1992)); *see also Humphries v. CBOCS W., Inc.,* 474 F.3d 387, 405 (7th Cir. 2007) ("[T]he

purpose of the similarly situated requirement is to eliminate confounding variables, such as

differing roles, performance histories, or decision-making personnel . . . .").

Here, Manguiat has failed to adduce any evidence showing that with respect to her

performance reviews, teaching certificate, and probationary period, she was treated differently

than similarly situated non-Filipino employees. Specifically, Manguiat has not identified any

comparators who, like her, were not meeting the School Board's performance, but, unlike her,

did not have his or her probationary period extended. Nor has she identified any comparators

who, like her, were not meeting the School Board's performance, but, unlike her, did not have

his or her teaching certificate lowered. Accordingly, Manguiat has failed to establish a prima

facie case of race-based or nationality-based disparate treatment. *See Dones v. Donahoe*, 987

F.Supp.2d 659, 669 (D. Md. 2013) (plaintiff failed to satisfy fourth element of his disparate

treatment claims where he "provided no information as to sex or age of these other postal

employees, their supervisors, their job duties, or their physical condition that resulted in them

being allowed to use a swivel chair"). Manguiat has therefore failed to establish her prima facie

case and her disparate treatment claims fail for this reason alone.

### c.    Legitimate Non-Discriminatory Reason & Pretext

Even assuming that Manguiat had adequate comparator evidence and thereby met her

prima facie case, the School Board has put forth sufficient evidence of a legitimate, non-

discriminatory reason for extending Manguiat's probationary period, for lowering her teaching

certificate, and for her poor performance reviews. *See Monroe–Lord v. Hytche,* 668 F.Supp. 979,

999 (D.Md.1987), *aff'd,* 854 F.2d 1317 (4th Cir.1988). Specifically, the School Board has

provided the Court with sufficient evidence to establish that at the time of each of these actions

Manguiat was not meeting the School Board's legitimate performance expectations. In fact, as

early as October 2009, the School Board deemed Manguiat's performance to be unsatisfactory.

And although Manguiat was not evaluated again until January 2011, the School Board again

found her performance to be unsatisfactory at that time, just as it did in June 2011 during

Manguiat's end-of-the-year evaluation. Thus, based on what the School Board perceived as

Manguiat's unsatisfactory performance, it decided to extend her probationary period, lower her

teaching certificate, and give her poor performance reviews. Under these circumstances then, the

School Board has put forth legitimate non-discriminatory business reasons for its actions. *See*

*e.g., Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) (affirming district court's

finding of defendant-employer's legitimate non-discriminatory reason for terminating plaintiff

where plaintiff "was terminated for performance-related reasons"); *Taylor v. Rite Aid Corp.*, 993

F.Supp.2d 551, 568 (D. Md. 2014) ("defendants have produced evidence of a legitimate, non-

discriminatory reason for [plaintiff's] termination—her documented performance problems in the

area of associate counseling"). Thus, if Manguiat had established a prima facie case (which she

has not), the burden would now shift back to her to show that the reasons proffered by the School

Board were merely a pretext for a discriminatory purpose.

To prove pretext, a plaintiff must either show that the employer's explanation is

"'unworthy of credence' 'or offer other evidence that is sufficiently probative of intentional

discrimination.'" *Moore v. Leavitt*, No. 04–2819, 2007 WL 5123539, at *3 (D. Md. Feb. 9,

2007) (citing *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir.2004)). Manguiat cannot

demonstrate either. First, Manguiat has not demonstrated that the School Board's concerns about

her performance are unworthy of credence.  Importantly, Manguiat overlooks the crucial fact that

prior to any of the alleged adverse actions she claims she endured, the School Board had already

deemed Manguiat's performance unsatisfactory as early as October 2009. This fact alone

substantially, if not entirely, discredits Manguiat's allegations of pretext. Nor has Manguiat

offered any evidence probative of intentional discrimination. At most, Manguiat relies on

statements made by various school employees and school students that she contends are evidence

of the School Board's discriminatory animus. *See* ECF No. 3 at ¶¶ 24-26. However, as discussed

*supra* Section II.A.1, the vast majority of these statements are race and nationality neutral and

the remaining isolated statements are plainly insufficient to create a genuine issue of material

fact as to pretext. Accordingly, the Court will grant the School Board's motion for summary

judgment as to Manguiat's disparate treatment claims.

### 3.     Retaliation

Manguiat also asserts a retaliation claim against the School Board. *See* ECF No. 3 at 10-11. Title VII prohibits discrimination against an employee in retaliation for the employee's opposing the employer's illegal discrimination practices or participating in Title VII enforcement proceedings. *See* 42 U.S.C. § 2000e-3(a). To establish a *prima facie* case of retaliation, Manguiat must show that (1) she engaged in a protected activity; (2) the School Board took an adverse employment action against her; and (3) there was a causal link between the protected activity and adverse action. *See E.E.O.C v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005); *see also* 42 U.S.C. § 2000e-3(a). Williams has failed to establish the third prong of her *prima facie* case.

Manguiat contends that she engaged in protected activity when she complained about alleged race-based and nationality-based discrimination by Strawbridge. *See* ECF No. 36-1 at 21. According to Manguiat, she first voiced these concerns on February 2, 2010. *See id.* at 11. After that, Manguiat contends that Strawbridge started retaliating against her through various acts, including by refusing to give Manguiat praise for her students' test results, recommending an additional year of probation, refusing to provide her with a full-time mentor, excluding her from a teachers' meeting, and lowering her teaching certificate. *See id.* Several of these alleged retaliatory acts, however, pre-dated Manguiat's protected activity which first occurred on February 2, 2010. *See* ECF No. 36-16 at ¶ 12; *see also* ECF No. 36-1 at 11. Specifically, Manguiat concedes that it was in January 2010 when Strawbridge refused to give her praise for her students' test results. *See* ECF No. 3 at ¶ 31. Similarly, it was on January 26, 2011, when Strawbridge allegedly excluded Manguiat from a teachers' meeting and when she recommended an extension of her probationary period. *See id.* at ¶ 32-34. Thus, because the alleged retaliation

took place before Manguiat engaged in protected activity there can be no causal connection

between the two.  *See Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir.2006)

(affirming summary judgment where the "actions that led to [plaintiff's] probation and

termination began before her protected activity, belying the conclusion that a reasonable

factfinder might find that [defendant's] activity was motivated by [plaintiff's] complaints").

    As for the two remaining alleged adverse actions that occurred after Manguiat engaged in

protected activity (*i.e.* refusing to provide Manguiat with a full-time mentor and lowering her

teaching certificate), Manguiat has similarly failed to demonstrate the requisite causal link

between the protected activity and the adverse actions. For a retaliation claim, a plaintiff "must

establish that his or her protected activity was a but-for cause of the alleged adverse action by the

employer," not just a "motivating factor" to establish the causation element of a retaliation

claim." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533-34 (2013). Here,

Manguiat has failed to establish that her protected activity was a but-for cause of the School

Board's alleged refusal to provide her with a full-time mentor and for its lowering of her

teaching certificate. As for Manguiat's teaching certificate being lowered, the School Board has

adequately demonstrated that that action was taken in response to Manguiat's unsatisfactory

performance, which had been established as unsatisfactory prior to Manguiat's protected activity.

Because Manguiat has not provided the Court with any reason to believe that this reason was

pretextual, the Court is unable to find a causal link between the protected activity and her

teaching certificate being lowered. Nor is there any causal connection between the School

Board's alleged failure to provide Manguiat a mentor and her protected activity as it is

undisputed that Manguiat was provided with mentoring from McCain – albeit a person who

Manguiat did not deem qualified to be her mentor. *See* ECF No. 36-1 at 1-2; *see also* ECF No. 3

at ¶ 54; ECF No. 36-16 at ¶ 25-27. Accordingly, the Court will grant the School Board's motion for summary judgment as to Manguiat's retaliation claim.

### 4.      Breach of Contract

Finally, Manguiat alleges in Count I of her complaint that the School Board breached its contract with her by failing to provide her timely notice of the School Board's decision to extend her probation for a third year thereby preventing her from becoming tenured. *See* ECF No. 3 at ¶¶ 68-74.[9]

Upon being hired by the School Board, Manguiat was placed on a mandatory two year probationary period. *See* ECF No. 36-10. The School Board could extend this probationary period for a third year if, at the end Manguiat's second school year (2009-2010) she did not qualify for tenure. *See* ECF No. 36-10. In order to determine if a teacher qualifies for tenure, the School Board evaluates a teacher's "established performance evaluation criteria" as well as the teacher's "strong potential for improvement." *Id.* With these factors in mind, the Superintendent of Prince George's County Public Schools wrote a letter to Manguiat on April 20, 2010 indicating that she "did not qualify for tenure at the end of [her] second year based on established performance evaluation criteria." ECF No. 33-17. As such, the School Board "extended [her] probationary period for a third year." *Id.* In doing so, Manguiat contends that the School Board breached the contract by failing to provide her with timely notice of its decision to extend her

---

[9] Manguiat also contends that the School Board breached its contract by failing to provide her with a mentor. *See* ECF No. 3 at ¶ 73. The contract provides that if Manguiat's "probationary period is extended . . . , the [School Board] shall assign a mentor to the employee." ECF No. 36-10. There is no dispute, however, that Manguiat was in fact provided with a mentor after her probationary period was extended. *See* ECF No. 3 at ¶ 53-54; *see also* ECF No. 36 at 4; ECF No. 36-16 at ¶ 25-27. That Manguiat was not satisfied with her mentor's credentials does not change the fact that Manguiat did, in fact, receive a mentor after having her probationary period extended. The Court will therefore grant the School Board's motion for summary judgment as to this aspect of Manguiat's breach of contract claim.

probationary status, which the contract required the School Board to provide either before June 15, 2009 or sixty (60) days prior to the second anniversary of her start date – *i.e.* November 9, 2009. *See* ECF No. 36-10.  Because the School Board did not notify her of its decision to extend her probationary status until April 20, 2010, Manguiat argues that the School Board's notice was untimely and therefore in breach of the contract.

The School Board, on the other hand, contends that it did not breach the contract because Manguiat's probationary period was never actually extended (this despite the April 2010 letter from the Superintendent suggesting otherwise). *See* ECF No. 33-1 at 12. According to the School Board, in order for a teacher's probationary period to be extended at the end of his or her second year, the School Board must receive an unsatisfactory annual evaluation of that teacher demonstrating that he or she is ill-suited for tenure.  *See id.* Because Manguiat was never evaluated at the end of the 2009-2010 school year, the School Board maintains that it could not have extended Manguiat's probationary period. *See id.*

The contract, however, does not require the formal submission of an unsatisfactory annual evaluation at the completion of a teacher's second year for one's probationary period to be extended for a third year. *See* ECF No. 36-10. Rather, under the contract, a teacher's probationary period will be extended if, at the end of his or her second year, he or she is not meeting the School Board's "established performance evaluation criteria" and if he or she "demonstrates a strong potential for improvement." *Id.* Here, Manguiat completed her second school year in June 2010. At that time, it was well-established that Manguiat was not meeting the School Board's performance expectations. Accordingly, Manguiat would not have been eligible for tenure, as was conveyed to her by the School Board's Superintendent in April 2010. *See* ECF No. 33-17. The School Board cannot now, in the face of litigation, claim that Manguiat was

23

granted tenure due merely to its failure to complete an annual review of Manguiat. *See* ECF No. 33-1 at 12. And to the extent they do make such a claim, at best, they create a factual dispute to be resolved at trial. The Court must therefore deny the School Board's motion for summary judgment as to Manguiat's breach of contract claim.

IV.     **CONCLUSION**

For the reasons discussed, the School Board's motion to strike is granted and its motion for summary judgment is GRANTED, in part, and DENIED, in part. Specifically, the Court is granting the School Board's motion for summary judgment as to Manguiat's disparate treatment claims (Counts II, III, and VI), her retaliation claim (Count IV), and her hostile work environment claims (Counts V and VII). The Court is denying the School Board's motion as to Manguiat's breach of contract claim (Count I). A separate Order follows.


Dated: May 18, 2015                                             _____/S/_____
                                                               George Jarrod Hazel
                                                               United States District Judge